# EXHIBIT B

## AGREEMENT FOR THE PURCHASE OF ASSETS

1. <u>Sale and Purchase of Restaurant Assets</u>.  Etta Bucktown, LLC ("*Bucktown*"), 1840 North Ave. Corp. ("*1840*"), Etta Scottsdale, LLC ("*Scottsdale*"); Etta River North, LLC ("*River North*"); and Aya Bakery, LLC ("*Aya*" and together with Bucktown, 1840, River North, and Scottsdale, the "*Sellers*") hereby agree that in consideration of the Purchase Price (as defined below), and on the terms and conditions hereinafter set forth in this Agreement for the Purchase of Assets (this "*Agreement*"), Sellers will sell and convey, or cause to be conveyed to inKind Cards Inc. ("*inKind Cards*") or an entity to be formed by inKind Cards ("*Buyer*"; and together with Sellers, the "*Parties*"), and Buyer agrees to purchase from Sellers, substantially all of Sellers' tangible and intangible assets (the "*Assets*") less the Excluded Assets, free and clear of all claims, liens, and liabilities (other than Assumed Liabilities, as defined below) (subject to the terms and conditions set forth herein, the "*Asset Sale*"). For the avoidance of doubt, the Assets shall include all intellectual property assets owned by Sellers, including but not limited to, in the case of Aya, the tradename "Aya Pastry," including, without limitation, any and all trademarks, tradenames, logos, and other associated intellectual property relating to the "Aya Pastry" brand.

2. <u>Sale of "Etta" IP Assets</u>. Pisor Ventures, LLC ("*Ventures*") separately agrees to sell and convey or cause to be conveyed to Buyer at Closing (subject to the occurrence of the Closing for the Asset Sale) all rights relating to the tradename "Etta," including, without limitation, trademarks, tradenames, logos, and any other associated intellectual property relating to the "Etta" brand (the "*Etta IP*") for $1 (the "*IP Sale*"). The Etta IP shall be transferred to Buyer at Closing free and clear of liens, either by written agreement of Venture's secured creditor, Wintrust Bank, N.A., or via order of the Bankruptcy Court.

3. <u>NorthStar Equipment</u>. To the extent Buyer wishes to continue to lease and ultimately purchase those assets that are currently asserted to be owned by NorthStar Equipment Leasing ("*NorthStar*") and leased to Sellers (most or all of the restaurant equipment at River North and Scottsdale) (the "*NorthStar Equipment*") pursuant to certain equipment leases between River North and Scottsdale and NorthStar (the "*NorthStar Leases*"), Buyer understands and agrees that it will need to enter into a separate agreement with NorthStar to assume the NorthStar Leases on the terms and conditions provided for in that certain Letter of Intent, dated March 13, 2024, between NorthStar, and River North and Scottsdale, a true copy of which has been provided by Sellers to Buyer (the "*NorthStar LOI*"). For the avoidance of doubt, the Assets do not include the NorthStar Equipment and the NorthStar Leases are not being assumed by Buyer pursuant to this Agreement.

4. <u>Bucktown Storage Lease</u>. Buyer understands that 1840 is party to a lease agreement (the "*Bucktown Apartment Lease*") for an apartment which adjoins Bucktown, and which Bucktown uses for storage.  This leased property is located as 1838 W. North Ave., Apt. 1, Chicago, IL 60622 and the principal of the landlord (the "*Bucktown Landlord*") is the same person who ultimately owns the landlord for the main Bucktown lease. The current Bucktown Apartment Lease expires on April 30, 2024. 1840 is willing to assume and assign the Bucktown Lease to Buyer (if desired), and Sellers will cover any Cure Amount associated with the Bucktown Lease (as it is current). Moreover, 1840 believes that the Bucktown Landlord will be amenable to renewing the Bucktown Apartment Lease, and the

Sellers are in the process of seeking confirmation of same. Buyer understands that there is no certainty that the Bucktown Apartment Lease can be renewed beyond its current expiration, and that if not, Bucktown would have to make alternative storage arrangements.

5. Bankruptcy Court Approval.  Buyer understands and agrees that Sellers have initiated Chapter 11 bankruptcy proceedings ("*Bankruptcy Cases*") in the United Stated Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), and that the Asset Sale will need to be approved via an order ("*Approval Order*") of the Bankruptcy Court, which Approval Order shall be reasonably acceptable to Buyer and shall order the conveyance of the Assets to Buyer free and clear of any liabilities other than Assumed Liabilities, if any. The Bankruptcy Court has approved the bid procedures ("*Bid Procedures*") for the sale of the Assets.  Sellers shall file a motion seeking the approval of the sale and entry of the Approval Order (the "*Sale Motion*").

6. Reserved.

7. Closing. The closing of this sale under the Agreement (the "*Closing*") will take place on the date selected by Buyer and Sellers that is not more than seven (7) business days following the satisfaction or waiver of the conditions precedent to the Closing, including entry by the Bankruptcy Court of the Approval Order and expiration of the period to appeal the Approval Order (such date, the "*Closing Date*"); provided, however, such Closing Date shall occur on or before April 15, 2024.  The Closing may occur remotely or at a location reasonably acceptable to both Parties.

8. Excluded Assets.  At any time prior to the Closing, Buyer shall have the right to designate any of the Assets as "Excluded Assets", and if so designated, such assets ("*Excluded Assets*") will remain property of the respective Seller.  Subject to and in addition to the foregoing right to designate additional Excluded Assets, the following Assets shall constitute Excluded Assets:  (a) Sellers' rights under this Agreement; (b) employee benefit plans and all assets associated therewith; (c) tax records, returns, credits and rights to tax credits, and refunds and rights to tax refunds; (d) all contracts and agreements other than the Designated Contracts (as defined below); (e) cash and bank accounts; (f) causes of action, including avoidance and related actions, arising under Sections 542, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code; (g) any rights under pre-petition or post-petition financing arrangements; (h) Sellers' financial books and records; and (i) Assets of any Seller for which Buyer does not designate such Seller's real property lease as a Designated Contract.

9. Contracts and Leases.  The Sale Motion shall include a list of all contracts and leases for each Seller and the proposed Cure Amounts (as defined below), if any, that would be payable as of the Closing Date in connection with the assumption of each. Sellers will provide proper and sufficient notice to the counterparties to such contracts and leases, and request authority to assume and assign to Buyer such contracts or leases as Buyer designates in writing prior to Closing (any designated contracts and leases, the "*Designated Contracts*"), in each case subject, as applicable, to the payment of the associated cure amount (or a different amount agreed to between Buyer and the counterparty or ordered by

the Bankruptcy Court) by Buyer at Closing (any such amounts, collectively, the "*Cure Amounts*").

10. Assumed Liabilities.  Buyer shall assume no debts, liabilities, obligations or duties of Sellers except for the following (collectively, the "*Assumed Liabilities*"):

    a. Post-closing obligations and liabilities arising under the Designated Contracts, and

    b. Any other liabilities that Buyer agrees to assume in writing and prior to Closing.

    Other than with respect to the Assumed Liabilities, neither Buyer nor any of Buyer's affiliates shall be liable for, and they specifically do not assume or agree to pay, perform or discharge any debt, claim, lien, obligation, duty, contract, agreement, tax or liability, known or unknown, contingent or otherwise, of any kind or nature, regardless of whether they relate to the Assets, including trade payables, any other accounts or notes payable, secured debt obligations, accrued expenses or liabilities, debt or debt equivalents, Employee Retirement Income Security Act and pension liabilities, bank overdrafts, any fees or expenses incurred by Sellers in connection with this transaction, tax liabilities, contingent liabilities or amounts due to shareholders, environmental matters, employee benefit plans, any medical malpractice or personal injury proceedings or claims, any employment disputes and  liabilities, any commercial disputes and liabilities, any debts, capital leases, any payor and governmental claims and liabilities and any liabilities arising out of the Bankruptcy Cases, any claims related to fraudulent or improper pre-Closing billings, employee severance, employee wages and vacation time/pay.  The assumption by Buyer of the Assumed Liabilities shall in no way expand the rights or remedies of any third party against Buyer or Sellers as compared to the rights and remedies which such third party would have had against Sellers absent the Bankruptcy Cases, or had Buyer not assumed such Assumed Liabilities.  Without limiting the generality of the preceding sentence, the assumption by Buyer of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the person whose liability is assumed.

11. Purchase Price.  The purchase price ("*Purchase Price*") for the Assets shall be paid at Closing in cash (U.S. dollars) and shall be comprised of (a) cash in the amount of $4,050,000 (allocated as follows: $249,999 for Bucktown, $1 for 1840, $250,000 for Scottsdale, $3,500,000 for River North, and $50,000 for Aya) (Buyer may re-allocate the Purchase Price in its reasonable business judgment prior to Closing if it chooses not to acquire the Assets and assume the lease of one or more of the foregoing locations) plus (b) payment of the Cure Amounts for any and all Designated Contracts agreed to by Buyer.

12. Deposit.  Prior to the date hereof, Buyer has transferred $67,500 as a deposit (the "*Deposit*") in the form of a certified check, cash, or otherwise immediately available funds to be held in escrow by the Debtor's counsel, Goldstein & McClintock LLLP, in accordance with the Bid Procedures. The Deposit will be held in escrow through Closing and if the Assets are sold to Buyer at Closing, shall be applied to the Purchase Price on the Closing Date. If Buyer is not the winning bidder, the Deposit will be refunded in accordance with the Bid Procedures.

13. <u>Conditions</u>. The following shall be conditions precedent to the Closing:

(a) Entry of the Approval Order by the Bankruptcy Court approving and authorizing Sellers to transfer the Assets to Buyer free and clear of all liabilities and encumbrances (other than Assumed Liabilities) pursuant to the Agreement and expiration of the period for appealing the Approval Order.

(b) Buyer being authorized to take assignment of all Designated Contracts upon payment of associated Cure Amounts.

(c) The Etta IP assets being conveyed free and clear of liens at Closing as required hereunder.

(d) The Buyer's Obligation to pay Cure Amount for the Sellers' real property leases (if assumed) shall be no more than: (a) $205,000 for Scottsdale; (b) $40,000.00 for Bucktown / 1840; (c) $0 for Aya; and (d) the full Cure Amount as determined by the Court or agreement with the landlord for River North. For Scottsdale, Aya, and Bucktown / 1840, to the extent the Cure Amounts for such leases exceeds the amounts in the prior sentence, the Sellers may elect to pay such excess from the sale proceeds.

(e) In the event Buyer's application for a liquor license for the Bucktown location is pending before the relevant state authorities as of the Closing Date, 1840 shall enter into an Interim Management Agreement, substantially in the form attached hereto as **Exhibit A**, to manage the liquor operations of each such restaurant until such time as the Buyer obtains the necessary liquor license from the applicable state authority.

(f) In the event Buyer elects to assume the NorthStar Leases, NorthStar enters into an Assignment and Assumption Agreement with Buyer materially consistent with the terms of the NorthStar LOI or Buyer otherwise reaches agreement with NorthStar on a purchase or other arrangement for the NorthStar Equipment.

(g) The Assets not having materially changed between the execution of this Agreement and the Closing Date except for the ordinary wear and tear of the Assets.

14. <u>Adherence to Bid Procedures and Jurisdiction</u>. By signing this Agreement, Buyer acknowledges and agrees to be bound by and honor the terms of the Bid Procedures. In addition, Buyer agrees to submit to the jurisdiction of and entry of final orders by the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the qualification of Alternative Bids, the Auction (as defined in the Bid Procedures), the transaction documents related to the Sale, and the Closing, as applicable. Buyer acknowledges that in entering into this Agreement, Buyer did not engage in any collusion with any third party in submitting this Agreement.

15. <u>Access to Information; Full and Prompt Due Diligence</u>. Sellers shall provide, and cause their representatives to provide, to Buyer and Buyer's affiliates, employees, officers, directors, officers, attorneys, accountants, advisors, lenders, and other agents (collectively, the "*Representatives*") access to personnel, books and records, and financial, legal, tax, and other data and information as requested by Buyer or its Representatives. The foregoing

includes, without limitation, Sellers' obligation to respond to any due diligence requests submitted by Buyer and its Representatives promptly and fully.

16. <u>Taxes</u>.  Sellers shall pay all sales, use, transfer and documentary taxes payable in connection with the transactions contemplated by this Agreement. The Parties agree to cooperate with one another to prepare and file, or cause to be prepared and filed, with the relevant governmental authorities, all transfer tax returns, affidavits and other similar instruments, if any, required in connection with the payment of the foregoing expenses.

17. <u>Sellers' Default</u>.  It is acknowledged and agreed by the Parties hereto that in the event that Sellers default on their obligations under this Agreement, that Buyer's damages will be limited to (i) the return of the Deposit and (ii) the right to seek specific performance from the Bankruptcy Court to force Sellers to sell the Assets. If Buyer defaults, Sellers shall be entitled to retain the Deposit as liquidated damages and shall be allowed to accept an Alternative Bid for the Assets.

18. <u>Approval Order</u>.  If Buyer is the prevailing bidder at the Auction, Sellers and Buyer shall use their reasonable best efforts to obtain entry of an Approval Order and Confirmation Order, in substance satisfactory to Buyer, by the Bankruptcy Court pursuant to, without limitation, Sections 363 and 365 of the Bankruptcy Code, which shall approve this Agreement and the transactions described herein, and which shall contain, among other provisions reasonably requested by Buyer and those described above, customary provisions approving the transactions contemplated hereby, approving the assumption and/or assumption and assignment of any Designated Contracts, and finding that Buyer is a good faith purchaser.  Sellers and Buyer understand and hereby agree that this Agreement is contingent upon entry by the Bankruptcy Court of the Approval Order.  To the extent necessary, Buyer agrees that it will cooperate and promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Approval Order and the Confirmation Order.

19. <u>Other Provisions</u>.

    a. <u>Costs and Expenses</u>.  The Parties shall bear their own costs and expenses in connection with this Agreement and the transactions contemplated hereunder, including any attorney and accounting fees.

    b. <u>Assignment</u>.  Buyer may not assign its rights under this Agreement without the consent of Sellers other than to a direct or indirect subsidiary or affiliate Buyer.  In the event of any such assignment, the assignee shall remain bound to perform the obligations assumed by the assignee. Sellers shall not be permitted to assign any of their rights under this Agreement.

    c. <u>Entire Agreement; Amendment</u>. This Agreement contains the entire understanding between the Parties regarding the subject matter hereof, and there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.  Modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed by the Parties hereto.

    d. <u>Legal Counsel and other Advisors</u>.  Each party represents that it has been represented by (or has had the opportunity to be represented by) legal counsel, tax advisers and other professionals in connection with the review of, negotiation of and execution of this Agreement.  Neither this Agreement, nor any of the agreements contemplated hereby, shall be construed against any party by virtue of the fact that any party prepared or drafted such agreements.

20. <u>Insurance</u>. Sellers agree to maintain reasonably commercial and customary insurance coverage on the Assets through the Closing Date.

21. <u>Other Representations.</u>  Buyer agrees that no other representations, either written or oral, have been made by Sellers or their representatives or relied upon by Buyer except as set forth in this Agreement.

22. <u>Governing Law</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, AND TO THE EXTENT APPLICABLE, FEDERAL BANKRUPTCY LAW, WHICH SHALL GOVERN THIS AGREEMENT, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

23. <u>Submission to Jurisdiction</u>.  The Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, or any breach or default hereunder, and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.

24. <u>Waiver of Jury Trial</u>.  EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

25. <u>Counterparts, Email and Facsimile Signatures</u>. This Agreement may be executed in whole or in counterparts together which shall make up the entire Agreement.  Email and facsimile signatures to this Agreement shall be accepted by the Parties the same as original wet signatures.

26. <u>Entire Agreement</u>.  This Agreement, together with the exhibits and schedules referenced herein, contains the entire agreement between the Parties relating to the subject matter hereof.

**This AGREEMENT is executed as of April \_\_\_\_\_ 2024.**

| | |
|---|---|
| **ETTA BUCKTOWN, LLC** | **INKIND CARDS INC.** |
| By: _____ <br> David Pisor, Authorized Representative | By: *[signature]* _____ <br> Name: Johann Moonesinghe <br> Title: CEO |

**1840 NORTH AVE. CORP.**

By: _____
    David Pisor, Authorized Representative

**ETTA SCOTTSDALE, LLC**

By: _____
    David Pisor, Authorized Representative

**ETTA RIVER NORTH, LLC**

By: _____
    David Pisor, Authorized Representative

**AYA BAKERY, LLC**

By: _____
    David Pisor, Authorized Representative

**PISOR VENTURES, LLC** (solely with respect to the IP Sale set forth in Paragraph 2)

By: _____
    David Pisor
    Title: Manager

**INTERIM MANAGEMENT AGREEMENT**

**THIS INTERIM MANAGEMENT AGREEMENT** ("*Agreement*") is made as of the \_\_\_\_ day of _____ 2024 by and between _____ (the "*Owner*"), and 1840 North Ave. Corp. (the "*Manager*").

**RECITALS:**

A.     The Owner is the purchaser, owner, and operator of a certain restaurant under the name and style of "Etta" at the premises commonly known as 1840 W. North Ave., Chicago, IL 60622 ("*Etta*").

B.     The Manager is the current holder of the Illinois Consumption on Premises-Incidental Activity License (the "*Liquor License*") pursuant to which Etta is permitted to sell alcohol to customers who purchase and consume food in the restaurant (the "*Liquor Operations*").

C.     The Owner has applied for an Illinois Consumption on Premises-Incidental Activity License in its own name and its application is currently pending before the Illinois Liquor Control Commission.

D.     During the pendency of its application, the Owner desires to engage the Manager, and the Manager desires to be engaged by the Owner, to operate and manage the Liquor Operations of Etta pursuant to the terms of the Liquor License and those terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing recitals, which are hereby fully incorporated into this Agreement, and for good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as set forth below.

**AGREEMENT:**

1. **Management**

(a) Commencing on the \_\_\_\_day of _____, 2024 (the "*Commencement Date*"), the Owner hereby engages Manager to manage and operate the Liquor Operations of Etta pursuant to the terms and conditions imposed herein, in accordance with all applicable laws, rules and regulations, including the terms of the Liquor License, and subject to the rights and powers reserved by the Owner in this Agreement.

Manager agrees, during the term of this Agreement, to diligently supervise and manage the sale of alcoholic beverages at Etta, complying with all requirements of the Liquor License, including controlling ingress and egress so as to prevent the unlawful removal of alcoholic beverages from Etta and to prevent the sale of alcoholic beverages to persons under the "Minimum legal Drinking Age" (as defined by State Law).

(b) Without limitation, the Owner agrees, during the term of this Agreement, to fully cooperate with the Manager's efforts to manage the Liquor Operations at Etta in accordance with any and all applicable laws.

2. **Management Fee.**  In consideration for Manager performing its duties under this

Agreement, the Buyer shall pay a fee of $0 per month to the Manager (the "*Management Fee*").

3. **Alcoholic Beverages.** Notwithstanding Owner's operation of Etta, and anything to the contrary contained in this Agreement, during the term of this Agreement the Manager shall be deemed to exercise the ownership and control over the sale of all alcoholic beverages at Etta and shall retain all ownership and control of the Liquor License.

4. **Term & Termination.**

    (a) The term ("*Term*") of this Agreement and all rights and duties of the parties set forth herein, shall commence on Commencement Date and shall terminate upon the earlier of: (i) the date on which Owner's application for an Illinois Consumption on Premises-Incidental Activity License is granted by the Illinois Liquor Control Commission, or (ii) six months after the Commencement Date.

    (b) A non-breaching party shall have the right to terminate this Agreement upon written notice to the breaching party delivered after the breaching party defaults in performance of or breaches any of its obligations, covenants or agreements set forth in this Agreement and does not cure same within ten (10) days after written notice from the non-breaching party or, if the default or breach cannot reasonably be cured within ten (10) days, the breaching party fails to commence to cure the default within ten (10) days after the written notice from the party or thereafter fails diligently to effect a cure as promptly as practicable.

5. **Indemnification of Manager.** The Owner shall indemnify, defend and hold harmless the Manager, its owners and employees, from and against all direct and indirect costs, claims, suits, judgments, losses, damages and liabilities (including reasonable attorneys' fees) arising out of or due to any negligent act or omissions of the Owner, or any of its owners (including shareholders, officers and directors) or employees, in the performance (or nonperformance) of the Owner's duties under this Agreement.

6. **Indemnification of Owner.** Manager shall indemnify, defend and hold harmless the Owner, its owners (including shareholders, officers and directors) and employees, from and against all direct and indirect costs, claims, suits, judgments, losses, damages and liabilities (including reasonable attorneys' fees) arising out of or due to any negligent act or omission of Manager, or any of its owners or employees, in the performance (or nonperformance) of Manager's duties under this Agreement.

7. **Insurance**. Owner shall obtain and maintain insurance necessary to meet any and all of its obligations as the owner of a restaurant that sells alcohol, which insurance shall name the Manager as an additional insured.

8. **Time**. Time is of the essence with respect to the performance of each of the covenants and agreements contained in this Agreement.

9. **Independent Contractor**. The parties agree and acknowledge that no relationship other than that of independent contractor is established hereby. The Manager is not an employee or joint venture or partner of or with the Owner and this Agreement does not create any agency between the Manager and the Owner. No party shall represent to any third party that it is the employee, agent, joint venture, or partner of the other or make any

representation or warranty on behalf of or in the name of the other or conduct any business or accept payment or service of legal process for the other. Other than as expressly set forth in this Agreement, neither party shall have any express or implied right or authority to enter into any contract or assume or create any obligations on behalf of the other party. The Manager shall have the exclusive authority to manage, direct and control the means, methods, techniques, sequences, procedures, and coordination of its performance hereunder. The Manager shall be exclusively responsible for compliance with all applicable laws, regulations or rules with respect to the Liquor Operations.

10. **Miscellaneous Provisions.**

(a) **Recitals.** The Recitals set forth above constitute an integral part of this Agreement and are incorporated by reference herein.

(b) **Captions**. Section titles, captions and headings contained herein are inserted as a matter of convenience and are for reference only. They do not define, limit or describe the scope of this Agreement or any provision hereof.

(c) **Waiver.** The wavier by either party of any breach by the other party of the representations, warranties, promises and/or covenants contained herein shall not prevent the subsequent enforcement of any such representation, warranty, promise and/or covenant as to any aspect which has not been waived, nor shall it be deemed a waiver of any subsequent breach thereof. No waiver of any breach or violation hereof shall be implied from forbearance or failure by a party to take action thereon.

(d) **Governing Law /Venue.** This Agreement shall be governed by and construed in all respects in accordance with the laws of the State of Illinois and the parties hereby consent that the sole proper venue and jurisdiction for any disputes arising hereunder shall be in the federal and state courts situated in the County of Cook, State of Illinois.

(e) **Notices.** All notices, requests, demands, claims and other communications hereunder ("*Notices*") shall be in writing. Any Notice hereunder shall be deemed duly given (i) if it is sent by registered or certified mail, return receipt requested, postage prepaid; (ii) if it is sent by Federal Express or similar overnight courier services, return receipt requested, or (iii) when transmitted by facsimile or electronic mail, provided an electronic acknowledgement or receipt is generated, in each case, provided the same is addressed to the intended recipient as set forth below (or to such other address as the intended recipient may request by way of an appropriate Notice given in accordance with this Section 10.(e)):

If to the Owner:

_____

_____

_____

If to the Manager:

3

_____

_____

_____

(f) **Assignment.** This Agreement may not be assigned by *any party* without the prior written consent of the other. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors in interest and permitted assignees.

(g) **Entire Agreement.** This Agreement constitutes the entire agreement between the parties regarding the subject matter hereof and no terms, conditions or provisions other than those expressly contained herein shall be deemed to be part of this Agreement.

(h) **Amendments.** Neither this Agreement nor any of the terms and conditions hereof may be waived, amended or modified except by means of a written instrument duly executed by the Manager and the Owner.

(i) **Survival.** All of the promises, agreements, representations, warranties, restrictive covenants and indemnities made by the parties hereto in this Agreement shall survive the termination of this Agreement, subject only to the applicable statutes of limitations.

(j) **Attorneys' Fees**. The prevailing party shall be entitled to recover from the non-prevailing party all reasonable attorneys' fees, expenses and costs incurred in connection with any action or claim relating to or arising under this Agreement.

(k) **Cooperation.** Each party hereto shall cooperate with the other in order to promptly effectuate the obligations of the parties and in furtherance of the purpose of this Agreement.

(l) **Counterparts.** This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart.

**IN WITNESS WHEREOF,** the Owner and Manager have entered into this Agreement as of the date first above written.

OWNER                                                                           MANAGER

_____        _____
By:                                                                                    By: