**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ETTA SCOTTSDALE LLC, *et al.*,[1] | ) | Case No. 24-10063 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |

## SMALL BUSINESS DEBTORS' FIRST AMENDED
## CHAPTER 11 PLAN OF LIQUIDATION

You are encouraged to carefully review the full text of this document, including all exhibits and attachments. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**THE DEBTORS DO NOT INTEND TO SOLICIT ACCEPTANCES OF THIS PLAN AND WILL BE SEEKING CONFIRMATION PURSUANT TO SECTION 1191(B) OF THE BANKRUPTCY CODE.**

**INSTRUCTIONS REGARDING PLAN CONFIRMATION, INCLUDING THE CONFIRMATION HEARING DATE, WILL BE FURNISHED SEPARATELY.**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

Respectfully submitted,

Dated: May 10, 2024

**GOLDSTEIN & MCCLINTOCK, LLLP**

By: */s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk, Esq. (Bar ID 3320)
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

-and-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Etta Scottsdale, LLC (6137), Etta River North LLC (1790), Etta Bucktown, LLC (3845), Etta Collective, LLC (7346), Aya Bakery, LLC (9515), and 1840 North Ave. Corp. (9501). The location of the Debtors' corporate headquarters is 433 W. Van Buren Street, Chicago, IL 60607.

Matthew E. McClintock, Esq. (admitted *pro hac vice*)
Jeffrey C. Dan, Esq. (admitted *pro hac vice*)
111 W. Washington Street, Suite 1221
Chicago, IL 60602
Telephone: (312) 337-7700
mattm@goldmclaw.com
jeffd@goldmclaw.com

*Counsel for the Debtors and*
*Debtors-in-Possession*

**SUMMARY OF PLAN AND DISTRIBUTIONS TO CREDITORS**

The Debtors hereby propose the following First Amended Plan of Liquidation (the "*Plan*") pursuant to Sections 1121(a) and 1189 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* The Plan provides for distributions to Holders of Allowed Claims in accordance with the terms of the Plan.

The Debtors will ask the Bankruptcy Court to confirm this Plan. If the Bankruptcy Court confirms the Plan, then the Plan will be binding on the Debtors, all Creditors and Interest Holders, and any other parties-in-interest in the Bankruptcy Case. All Holders of Claims and Equity Interests are encouraged to read the Plan carefully.

As discussed in greater detail below, the assets of three of the Debtors – Etta Bucktown, Etta Scottsdale, and Aya Bakery – were sold via a Court-approved sale for a total sale price of $4,050,000. This Plan sets forth how the Debtors propose to allocate the sale proceeds and other assets among the Debtors, and then make distributions to creditors in accordance with the Bankruptcy Code's priority scheme.

In addition, the Plan contemplates the establishment of a liquidating trust to pursue the collection of other assets that may enhance creditor recoveries, wind-up the Debtors (such as completing final tax returns), and effectuate distributions.

**ARTICLE I**
**BACKGROUND**

A.    <u>Nature of the Debtors' Businesses</u>

The Debtors are part of a restaurant group that, prior to the sale of their assets discussed below, owned and operated neighborhood restaurants and a bakery in Chicago, IL and Scottsdale, AZ:

| Restaurant | Owner | Location |
|---|---|---|
| Etta Scottsdale | Etta Scottsdale | Scottsdale, AZ |
| Etta Bucktown | Etta Bucktown (most of the Bucktown assets) & 1840 North Ave. (just the lease and liquor license for the Bucktown Etta restaurant) | Chicago, IL |
| Etta River North | Etta River North | Chicago, IL |
| Aya Pastry | Aya Bakery | Chicago, IL |

The final Debtor, Etta Collective, is a management entity which provided shared management services to the operating Debtors. Each operating location historically contributed to the shared corporate overhead.

As of the Applicable Petition Date, the Debtors employed approximately 148 employees full-time and 43 employees part-time (collectively, the *"Employees"*) in numerous positions including managers, chefs, cooks, dishwashers, hosts, servers, bartenders, runners, cooks, bussers, and barbacks:

| Entity | Full Time | Part Time |
|---|---|---|
| Etta Scottsdale | 63 | 25 |
| Etta Bucktown | 56 | 14 |
| Etta River North | N/A | N/A |
| Aya Bakery | 25 | 4 |
| 1840 North Ave | N/A | N/A |
| Etta Collective | 4 | 0 |

## B.    Legal Structure and Ownership

All six Debtors are limited liability companies. David Pisor ("*Pisor*") is the majority owner of Etta Collective (Pisor owns 88% and other investors own 12%). The other operating Debtors are all majority- or wholly-owned and managed by Etta Collective as follows:

| Debtor | Etta Collective | Outside Investors |
|---|---|---|
| Etta Scottsdale | 86% | 14% |
| Etta Bucktown | 72% | 28% |
| Etta River North | 85% | 15% |
| Aya Bakery | 100% | 0% |
| 1840 North Ave. | 100% | 0% |

## C.    History and Events Leading to the Bankruptcy

The Debtors used to be part of an even larger group of restaurants. In January 2023, the partners in that group entered into a business separation agreement (the "*Separation Agreement*") whereby the restaurant locations were split up. Of relevance to this case, Etta Collective became the majority owner of certain entities, including the other Debtors. Since that transaction, the Debtors unfortunately struggled from the weight of legacy debts, unprofitable locations, and unfortunate circumstances.

In particular, the Etta location in Culver City struggled to gain profitability, and it had a very substantial lease. Other locations were also struggling, and the entire group was under financial strain as management tried to support these struggling locations. Making matters worse, debts that were supposed to be taken care of by counterparties to the Separation Agreement were not, so the companies were left to struggle with debts that were supposed to be paid by others. This

included, without limitation, approximately $1,031,179 in back sales tax debt for the Culver City location and at least $774,000 in other debts at various locations, including Debtor entities.

The Debtors believe they are eligible to receive substantial Employee Retention Credits (the "*ERC Tax Credits*") valued at approximately $1.01 million for Etta River North (which may be impaired for reasons the Debtors are investigating), $681,771 for Etta Bucktown, and $121,461 for Aya. These were unfortunately not received prior to the bankruptcy filings, which negatively impacted the Debtors' cash flow. The Creditor Trust will vigorously investigate and, if appropriate, pursue collection of the ERC Tax Credits for the benefit of beneficiaries.

On or about July 17, 2023, facing the above issues and in an effort to improve the Debtors' finances, the Wintrust Borrower Debtors, non-debtor Pisor, and non-debtor Pisor Ventures, LLC (collectively, the "*Wintrust Borrowers*") entered into the Wintrust Loans. The hope was that the Wintrust Loans would provide enough liquidity to turn the restaurants around and allow the group to regain profitability, including by ideally completing and opening new locations that were under development.

Unfortunately, the liquidity from the Wintrust Loans was not enough to solve the issues the Debtors were facing. The Etta location in Culver City had to close (leading to substantial legal fees, costs, and distraction). As the financial situation worsened, it became difficult to push forward with new concepts. The entities struggled to keep up with current obligations while reducing or keeping up with back obligations. Etta Collective in particular was also burdened by lease guarantees, including for some failed locations.

All of this resulted in arrearages with landlords and suppliers. For example, Etta Scottsdale fell behind on rent payments to the Scottsdale landlord, SDQ FEE, LLC, who in turn filed an eviction proceeding on January 5, 2024, which was set for hearing on January 18, 2024.

On January 17, 2024 – the day before the eviction hearing – Wintrust abruptly swept approximately $500,000 from accounts of the Debtors and certain of its affiliates, including certain of Pisor's personal funds at Wintrust. Among other things, this left Etta Scottsdale and Etta Collective as its manager without enough cash to cure or even reach a deal to continue the eviction proceeding.

In an effort to preserve the lease and keep the restaurant operational while it quickly explored sale and restructuring options, Scottsdale initiated the Scottsdale Bankruptcy on an emergency basis on January 18, 2024 (the "*Scottsdale Petition Date*"). The other five Debtors filed for bankruptcy protection on February 1, 2024 (the "*General Petition Date*" and collectively with the Scottsdale Petition Date, the "*Applicable Petition Date*").

### D.    The Sale of Substantially all of the Debtors' Assets in Bankruptcy

As restaurants, the Debtors' assets primarily consist of their leases and licenses, good will and operational cash-flows, built-out spaces, furniture, restaurant supplies, and perishable food and beverages. In bankruptcy, the Debtors proceeded with operations in the ordinary course with the ultimate goal of maximizing value and consummating a sale of substantially all of their assets.

With that goal in mind, on February 2, 2024, the Debtors filed their *Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with Sale of Assets of the Debtors, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* (the *"Sale Motion"*) [Doc. No. 56], whereby the Debtors sought approval to sell substantially all of their assets at a public auction.

On March 1, 2024, the Court authorized the Debtors' retention of Kudan Group, Inc. as the Broker for the sale of the Debtors' businesses and assets [Doc. No. 174].

On March 25, 2024, the Debtors held a public auction, and on March 26, 2024, the Debtors announced InKind Cards, Inc. as the successful bidder [Doc. No. 220]. On April 5, 2024, the Court entered the Sale Order approving the Sale Transaction for $4,050,000. [Docket No. 247]. The Sale Transaction closed on April 16, 2024, resulting in the transfer of ownership of substantially all of the Debtors' operating assets to the Buyer.

For purposes of the Plan, the Debtors attempted to allocate the $4,050,000 purchase price in the fairest possible manner between the Debtors. The allocation is based on the highest individual bids received at the Auction for those Debtors whose assets were actually sold in the Sale Transaction: (a) Aya Bakery: 9% (or $364,5000 based on gross Sale Proceeds); (b) Etta Bucktown: 52% (or $2,106,000 based on gross Sale Proceeds); and (c) Etta Scottsdale: 39% (or $1,579,500 based on gross Sale Proceeds). The Debtors have not allocated any of the Sale Proceeds to Etta River North and 1840 North Ave since neither entity held assets that were sold as part of the Sale Transaction.

### E.    <u>Avoidance Actions</u>

While a final review has not been completed, the Debtors are not aware of substantial avoidable transfers.

The Debtors note that David Pisor is an individual borrower on the Wintrust Loans and received $310,727 from the loan proceeds. To the extent the Debtors have claims against Mr. Pisor for contribution or otherwise based on the Debtors' proposed full repayment of the Wintrust Loans under the Plan, the Debtors reserve those claims. The Debtors anticipate that Mr. Pisor will assert that he provided consideration for the loan proceeds he received by virtue of (i) the substantial risk he incurred by agreeing to be a borrower on the Wintrust Loans; and (ii) the requirement that Mr. Pisor agree to be a borrower as a prerequisite for the Debtors obtaining the Wintrust Loans. Moreover, prior to the Scottsdale Petition Date, Wintrust swept at least $88,000 of Mr. Pisor's personal funds and applied those funds to the then balance of the Wintrust Loans. Finally, the $125,000 Wintrust DIP was funded with proceeds Wintrust claimed it was entitled to receive from an entity wholly owned by Mr. Pisor.

The Debtors and Creditor Trust reserve all rights to pursue claims, but presently do not believe that avoidance actions, to the extent any are pursued, are likely to materially improve creditor recoveries.

F.    **Debtors' Liabilities**[2]

**Wintrust Loans**: The Debtors' senior secured Lender is Wintrust. Shortly before the Scottsdale Petition Date, Wintrust was owed approximately $2.5 million. However, on January 17, 2024, Wintrust swept approximately $500,000 from accounts of the Debtors. This and subsequent sweeps have reduced the balance owed to Wintrust to approximately $1.44 million (not including reasonable interest and fees through the date of a payoff hereunder given that Wintrust appears to be oversecured).

The Debtors understand that Wintrust asserts a senior lien on substantially all assets of the Wintrust Borrower Debtors, including accounts, equipment, and proceeds (collectively, the "*Collateral*").

**SBA LendingClub Loan**: On or about August 30, 2017, 1840 North Ave. and Ezra 1840, LLC ("*Ezra 1840*"), the prior name of Etta Bucktown, entered into a U.S. Small Business Association loan with Radius Bank in the original principal amount of $2,300,000 (the "*SBA Loan*"). LendingClub Bank, N.A. (the "*SBA Lender*") asserts itself as the successor to Radius Bank.

The SBA Lender initially filed a UCC statement against Ezra 1840 on August 31, 2017 asserting a security interest in all assets including proceeds. On or about February 10, 2021, Ezra 1840 changed its name to "Etta Bucktown, LLC." The SBA Lender had four months to file an amendment financing statement pursuant to UCC § 9-507(c).

The SBA Lender filed a continuation statement on June 15, 2022 – past the four-month period for curing the initial financing statement. The continuation statement was not an amendment and contained the original name of the entity (*i.e.*, Ezra 1840, LLC), not the current name of the Debtor. As a result, a dispute arose between the SBA Lender and Wintrust with respect to lien priority vis-à-vis Etta Bucktown. The SBA Lender, Wintrust, and the Debtors have entered into the Bucktown Lien Priority Settlement to resolve the dispute, which settlement is incorporated herein and will be approved via the Confirmation Order.

**Overview of Claims by Debtor:** A breakdown of debts for each Debtor follows. As reflected in the "Notes" section, the amounts included are estimates based on the Debtors' initial review of filed and scheduled claims, and its understanding of what Claims are improperly filed and will need to be objected to. These are estimates only, however, and may change materially depending on the outcome of claim objections and other factors (which will impact estimated distributions). Moreover, the inclusion of any claim in the estimated column should not be deemed an admission that the Debtors will not object to such claim as the Debtors' review is ongoing and they reserve the right to object to any claim on any grounds:

---

[2] The Debtors reserve the right to object to any claim. The Debtors' use of a creditor's asserted claim amount is not an admission that the Debtors agree with the amount, but rather is an attempt by the Debtors to provide parties with a sense of the amount of claims that they understand creditors are asserting.

i.   **1840 North Ave.**

| Creditor / Class | Estimated Amount | Notes |
|---|---|---|
| Secured – SBA Lender | $1.32 million | Asserted amount – Debtors have not analyzed amount of claim (but agree that the claim is properly asserted against 1840 N. Ave. |
| Priority Unsecured | $16,406 | *Id.* |
| General Unsecured | $0 | Approximately $48,563 in additional claims have been filed, but preliminarily the Debtors do not believe such claims will be allowed against 1840 N. Ave. |
| **Total** | **$1.34 million** | |

ii.   **Aya Bakery**

| Creditor / Class | Approximate Amount | Notes |
|---|---|---|
| Priority Unsecured | $0 | $47,584 is asserted as priority, but most of this is asserted PACA Claims[3] that the Debtors believe are not valid (but will hold back funds to account for pending judicial resolution or settlement of the PACA issues). |
| General Unsecured | $72,792 | Asserted amounts less a $500,000 claim that Aya Bakery believes is not properly asserted against it. This amount will increase if any PACA Claims are deemed unsecured. |
| **Total** | **$72,729** | |

iii.   **Etta Bucktown**

| Creditor / Class | Estimated Amount | Notes |
|---|---|---|
| Secured – Wintrust | $1.44 million | Estimated amount – exact amount TBD at time of payoff. Four Debtors – the Wintrust Borrower Debtors – are jointly liable for this Claim – so the Plan seeks to ratably allocate payment of this Claim among such |

---

[3] The Debtors are evaluating assertions that certain PACA Claims are entitled to priority treatment under Section 503(b)(9). To the extent any portion of a PACA Claim is allowed under Section 503(b)(9), the Debtors will treat such portion as a priority claim.

| | | Debtors to the extent reasonably possible (*see* details herein). |
|---|---|---|
| Secured – SBA Lender | $1.32 million | Asserted amount – Debtors have not analyzed amount of claim (but agree that the claim is properly asserted against Etta Bucktown. |
| Priority Unsecured | $0 | $52,331 is asserted as priority, but most of this is asserted PACA claims that the Debtors believe are not valid (but will hold back funds to account for pending judicial resolution or settlement of the PACA issues). |
| General Unsecured | $2.66 million | Asserted amounts less unsecured claim filed by Wintrust (since Plan proposes to pay Wintrust in full). |
| **Total** | **$5.42 million** | |

### iv.    Etta Collective

| Creditor / Class | Estimated Amount | Notes |
|---|---|---|
| Wintrust / Secured | $1.44 million | Estimated amount – exact amount TBD at time of payoff. Four Debtors – the Wintrust Borrower Debtors – are jointly liable for this Claim – so the Plan seeks to ratably allocate payment of this Claim among such Debtors to the extent reasonably possible (*see* details herein). |
| Priority Unsecured | $0 | $45,874 is asserted as priority, but most of this is asserted PACA claims that the Debtors believe are not valid (but will hold back funds to account for pending judicial resolution or settlement of the PACA issues). In addition, Etta Collective is not expected to have funds available for distribution beyond paying a portion (less than its pro-rata share) of the Wintrust Secured Claim. |
| General Unsecured | $3.39 million | Asserted amounts less approximately $403,000 in known duplicate claims. |
| **Total** | **$4.83 million** | |

### v.    Etta River North

| Creditor / Class | Estimated Amount | Notes |
|---|---|---|
| Wintrust / Secured | $1.44 million | Estimated amount – exact amount TBD at time of payoff. Four Debtors – the Wintrust |

| | | Borrower Debtors – are jointly liable for this Claim – so the Plan seeks to ratably allocate payment of this Claim among such Debtors to the extent reasonably possible (*see* details herein). |
|---|---|---|
| Priority Unsecured | $0 | $48,766 is asserted as priority, but most of this is asserted PACA claims that the Debtors believe are not valid (but will hold back funds to account for pending judicial resolution or settlement of the PACA issues). |
| General Unsecured | $2.7 million | Asserted amounts less unsecured claim filed by Wintrust (since Plan proposes to pay Wintrust in full). This also includes a $111,749 claim that creditor Rewards Network asserted as secured (included here because Etta River North does not believe it is properly secured, and also because Etta River North currently does not have sufficient assets to even pay its share of the Wintrust Secured Claim). |
| **Total** | **$4.14 million** | |

### vi.   Etta Scottsdale

| Creditor / Class | Estimated Amount | Notes |
|---|---|---|
| Secured – Wintrust | $1.44 million | Etta Scottsdale is liable for 23% of the balance of the Wintrust Loans. |
| Secured – Rewards Network | $124,339 | Only to the extent the security interest is deemed valid (otherwise will become an unsecured claim to the extent Allowed). |
| Priority Unsecured | $0 | $140,269.29 is asserted as priority, but most of this is asserted PACA claims that the Debtors believe are not valid (but will hold back funds to account for pending judicial resolution or settlement of the PACA issues). |
| General Unsecured | $3.04 million | Asserted amounts less Wintrust (since Plan proposes to pay Wintrust in full). This also includes a $129,378 claim that creditor North Star Leasing has asserted as secured (equipment lease – likely to be only unsecured deficiency claim). |
| **Total** | **$4.60 million** | |

# ARTICLE II
## DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**A.     Rules of Interpretation, Computation of Time and Governing Law**

1.     For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender; (b) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document, an exhibit to be Filed, or an exhibit already Filed, shall mean such document or exhibit, as it is or as it may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form in the Plan that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning assigned to such term in the Bankruptcy Code.

2.     Except as otherwise specifically provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.     Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Illinois, without giving effect to the principles of conflict of laws thereof.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS

The Debtors' Plan must describe how its Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a Class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various Classes and describes the treatment each Class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

The Debtors do not intend to solicit acceptances of this Plan and will be seeking confirmation pursuant to Section 1191(b) of the Bankruptcy Code, which provides that a Court shall confirm a plan without all impaired classes voting in favor so long as the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and not accepted, the plan.

If a plan is confirmed under section 1191(b) of the Bankruptcy Code, then, pursuant to section 1191(c)(2), the plan must meet one of the following two requirements: (i) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan or (ii) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

## 3.1   Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified.  They are not considered impaired. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Plan does not place the following Claims in any Class:

### A.   Administrative Claims

The Debtors must pay all Administrative Claims in full.  If an Administrative Claim is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Claim, or in other words, "allow" the Administrative Claim. Any Administrative Claim that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtors (or Creditor Trust) and the Administrative claimant or court order. If the Administrative Claim is disputed, payment will be made after the Administrative Claim is allowed by the Bankruptcy Court.

The following chart lists the Debtors' estimated Administrative Claims, and their proposed treatment under the Plan:

| Type[4] | Estimated Amount | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Applicable Petition Date | $0 | Cash from the applicable Debtor that is the obligor on such claim equal to the amount of such Allowed Claim on an ongoing basis in accordance with the ordinary business practices and terms between the Debtors and its trade Creditors.  This is estimated at $0 because the Debtors' cash collateral budget contemplates payment of these amounts in the ordinary course (so ideally such amounts are paid prior to the Effective Date). |
| Allowed Claims for the value of goods received in the ordinary course of business within 20 days before the Aplicable  Petition Date | $0 | Payment through the Plan as follows: Cash equal to the amount of such Allowed Claim on the date of the Effective Date. |
| Professional fees, as approved by the Bankruptcy Court (e.g., Debtor's counsel, Subchapter V Trustee, and ordinary course professionals) | $360,000-400,000 (estimate through the Confirmation Date. May be higher or lower depending on work needed, and some of this will likely be paid prior to the Confirmation Date. This also assumes that the broker fee owed to Kudan Group from the sale has been paid separately prior to the Confirmation Date). | Etta Collective will pay such claims (following application of any available retainers) with Cash equal to the amount of such Allowed Claim within 3 business days after the court approves such professional fees and expenses on a final basis (or in accordance with other orders of the Bankruptcy Court). The Debtors shall contribute funds to Etta Collective and pay such amounts as Common Expenses as provided for herein. |
| UST fees | N/A | N/A – Subchapter V Case |
| **TOTAL:** | **$360,000-400,000** | |

---

[4] This assumes that amounts such as the Wintrust DIP and stalking horse break-up fee and expense reimbursement have been paid prior to confirmation.

B.     **Superpriority Claims**

Superpriority Claims are unsecured claims that are conferred priority treatment over all other Allowed Claims. The following chart lists the Debtors' estimated Superpriority Claims, and their proposed treatment under the Plan:

| Claimant/Basis | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| PACA Claims | *See* above breakdown of asserted PACA claims by Debtor in Article I | Payment through the Plan as follows: Cash equal to the amount of such PACA Claim if and to the extent Allowed as a PACA Claim (either by order of the Court or stipulation with the Creditor Trustee) |
| **TOTAL:** | **TBD** | |

C.     **Priority Tax Claims**

Priority Tax Claims are unsecured income, employment, and other taxes described by §507(a)(8) of the Bankruptcy Code. Unless the holder of such a §507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief. The following chart lists the Debtors' estimated Priority Tax Claims, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Internal Revenue Service | *See* above breakdown of asserted Claims by Debtor in Article I | The Debtor liable for such Claim shall, to the extent feasible, pay such Claim in Cash equal to the amount of such Allowed Claim. |
| Arizona Department of Revenue | *See* above breakdown of asserted Claims by Debtor in Article I | The Debtor liable for such Claim shall, to the extent feasible, pay such Claim in Cash equal to the amount of such Allowed Claim. |
| **TOTAL:** | **See Above** | |

**3.2**     **Classes and Treatment of Claims and Equity Interests**

The following are the Classes for each Debtor and the proposed treatment that they will receive under the Plan (provided that Holders of Claims in any Class may agree to a less favorable treatment):

**A.**     **1840 North Ave.**

| Class | Impairment |
|---|---|
| Class 1A – SBA Lender Claim | Impaired |
| Class 2A – Allowed Unsecured Claims | Impaired |
| Class 3A – Equity Interests | Impaired |

**Class 1A: SBA Lender Claim**

Treatment:  The SBA Lender shall receive any Distributable Proceeds[5] available if Priority Claims against the 1840 N. Ave. Debtor have been paid, up to the full amount of the SBA Lender's Allowed Claim. To the extent the SBA Lender's Allowed Claim is not paid in full, any deficiency claim will be treated as a Class 2A Allowed Unsecured Claim.

Voting:  Class 1A is Impaired.

**Class 2A: Allowed Unsecured Claims**

Treatment:  Holders of Allowed Unsecured Claims in Class 2A will receive a Pro-Rata share of any Distributable Proceeds after the SBA Lender / Class 1A Holder has been satisfied. The Debtors believe that Holders of Allowed Unsecured Claims in Class 2A will not receive a recovery.

Voting:  Class 2A is Impaired.

**Class 3A: Equity Interests**

Treatment:  All equity interests will be canceled on the Effective Date as they are not expected to see any recovery under the Plan.

Voting:  Class 3A is impaired.

**B.**     **Aya Bakery**

| Class | Impairment |
|---|---|
| Class 1B – Allowed Unsecured Claims | Impaired |
| Class 2B – Equity Interests | Impaired |

---

[5] *See* Article XII, Para. 40.

**Class 1B: Allowed Unsecured Claims**

Treatment:  Holders of Allowed Unsecured Claims in Class 1B will receive a Pro-Rata share of the Distributable Proceeds. The Debtors believe that Holders of Allowed Unsecured Claims in Class 1B will receive a recovery.

Voting:  Class 1B is Impaired.

**Class 2B: Equity Interests**

Treatment:  Holders of Allowed Claims in Class 2B will receive a Pro-Rata share of the Distributable Proceeds after Class 1B Claims have been fully satisfied. The Debtors believe that there is a material chance Holders of Class 2B Claims will receive a recovery.

Voting:  Class 2B is Impaired.

## C.    Etta Bucktown

| Class | Impairment |
|---|---|
| Class 1C – Wintrust Secured Claim | Not Impaired |
| Class 2C – SBA Lender Claim | Impaired |
| Class 3C – Allowed Unsecured Claims | Impaired |
| Class 4C – Equity Interests | Impaired |

**Class 1C:  Wintrust Secured Claim**

Treatment:   After the Wintrust DIP has been re-paid in full: The SBA Lender will receive the first $63,000 in Distributable Proceeds pursuant to the Bucktown Lien Priority Settlement. Thereafter Distributable Proceeds will be used to satisfy the full amount of the Wintrust Secured Claim, though to the extent possible, Etta Bucktown will only pay its portion of the Wintrust Secured Claim as contemplated by the Wintrust Secured Claim Allocation.

Voting:  Class 1C Claim is Unimpaired.

**Class 2C: SBA Lender Claim**

Treatment: After the Wintrust DIP has been re-paid in full: The SBA Lender will receive the first $63,000 in Distributable Proceeds pursuant to the Bucktown Lien Priority Settlement. Thereafter, the SBA Lender will receive 75% of all Distributable Proceeds available after Etta Bucktown has satisfied its obligations to Class 1C including reasonable fees and costs, up to the full amount of the SBA Lender's Allowed Claim. To the extent the SBA Lender's Allowed Claim is not

paid in full, any deficiency claim will be treated as a Class 3C Allowed Unsecured Claim.

Voting:  Class 2C Claim is Impaired.

**Class 3C: Allowed Unsecured Claims**

Treatment:  After the Wintrust DIP has been re-paid in full: The SBA Lender will receive the first $63,000 in Distributable Proceeds pursuant to the Bucktown Lien Priority Settlement. Thereafter, Class 3C Holders will receive a Pro-Rata portion of 25% of all Distributable Proceeds available after Etta Bucktown has satisfied its obligations to Class 1C.

Voting:  Class 3C is Impaired.

**Class 4C: Equity Interests**

Treatment:  All equity interests will be canceled on the Effective Date as they are not expected to see any recovery under the Plan.

Voting:  Class 4C is impaired.

D.    **Etta Collective**

| Class | Impairment |
|---|---|
| Class 1D – Wintrust Secured Claim | Not Impaired |
| Class 2D – Allowed Unsecured Claims | Impaired |
| Class 3D – Equity Interests | Impaired |

**Class 1D:  Wintrust Secured Claim**

Treatment:  All Distributable Proceeds will be used to satisfy the full amount of the Wintrust Secured Claim, though to the extent possible, Etta Collective will only pay its portion of the Wintrust Secured Claim as contemplated by the Wintrust Secured Claim Allocation. The Debtors believe that Etta Collective will likely be unable to pay its full portion of the Wintrust Secured Claim Allocation.

Voting:  Class 1D Claim is Unimpaired.

**Class 2D: Allowed Unsecured Claims**

Treatment:  Holders of Allowed Unsecured Claims in Class 2D will receive a Pro-Rata share of any Distributable Proceeds after Etta Collective has satisfied its obligations to Class 1D. The Debtors believe that Holders of Claims in Class 2D will likely not receive a recovery, but there is a possibly depending in part on recoveries and claim objections at other Debtors.

Voting:  Class 2D is Impaired.

**Class 3D: Equity Interests**

Treatment:  All equity interests will be canceled on the Effective Date as they are not expected to see any recovery under the Plan.

Voting:  Class 3D is impaired.

E.    **Etta River North**

| Class | Impairment |
|-------|------------|
| Class 1E – Wintrust Secured Claim | Not Impaired |
| Class 2E – Allowed Unsecured Claims | Impaired |
| Class 3E – Equity Interests | Impaired |

**Class 1E:  Wintrust Secured Claim**

Treatment:   All Distributable Proceeds will be used to satisfy the full amount of the Wintrust Secured Claim, plus reasonable fees and costs, though to the extent possible, Etta River North will only pay its portion of the Wintrust Secured Claim as contemplated by the Wintrust Secured Claim Allocation. The Debtors believe that Etta River North will likely be unable to pay its full portion of the Wintrust Secured Claim Allocation.

Voting:  Class 1E Claim is Unimpaired.

**Class 2E: Allowed Unsecured Claims**

Treatment:  Holders of Allowed Unsecured Claims in Class 2E will receive a Pro-Rata share of any Distributable Proceeds after Etta River North has satisfied its obligations to Class 1E. The Debtors believe that Holders of Claims in Class 1E will likely not receive a recovery, but there is a possibility depending in part on whether the ERC Tax Credit for Etta River North is collectible.

Voting:  Class 2E is Impaired.

**Class 3E: Equity Interests**

Treatment:  All equity interests will be canceled on the Effective Date as they are not expected to see any recovery under the Plan.

Voting:  Class 3E is impaired.

**F.**    **Etta Scottsdale**

| Class | Impairment |
|---|---|
| Class 1F – Wintrust Secured Claim | Not Impaired |
| Class 2F – Rewards Network | Impaired |
| Class 3F – Allowed Unsecured Claims | Impaired |
| Class 4F – Equity Interests | Impaired |

**Class 1F:  Wintrust Secured Claim**

Treatment:  All Distributable Proceeds will be used to satisfy the full amount of the Wintrust Secured Claim, though to the extent possible, Etta Scottsdale will only pay its portion of the Wintrust Secured Claim as contemplated by the Wintrust Secured Claim Allocation. The Debtors believe that Etta Scottsdale will likely be unable to pay its full portion of the Wintrust Secured Claim Allocation.

Voting:  Class 1F Claim is Unimpaired.

**Class 2F: Rewards Network**

Treatment:  To the extent Rewards Network's Claim is Allowed and deemed to be properly secured, Rewards Network shall receive all Distributable Proceeds after Etta Scottsdale has satisfied its obligations to Class 1F (up to the full amount of its Allowed Claim), plus all reasonable fees and costs. To the extent the Rewards Network's Claim is Allowed and deemed to be properly secured but not paid in full, any deficiency claim will be treated as a Class 3F Allowed Unsecured Claim. If Reward Network's Claim is determined by Court order or agreement to be entirely unsecured, Reward Network's Claim shall be deemed part of Class 3F.

Voting:  Class 2F is Impaired.

**Class 3F: Allowed Unsecured Claims**

Treatment:  Holders of Allowed Unsecured Claims in Class 3F will receive a Pro-Rata share of any Distributable Proceeds after Etta Scottsdale has satisfied its obligations to Classes 1F and 2F (as applicable). The Debtors believe that Holders of Claims in Class 3F will likely not receive a recovery, but there is a possibly depending in part on whether the ERC Tax Credit for Etta Scottsdale is collectible, and whether Rewards Network's Claim is deemed secured.

Voting:  Class 3F is Impaired.

**Class 4F: Equity Interests**

Treatment:  All equity interests will be canceled on the Effective Date as they are not expected to see any recovery under the Plan.

Voting:  Class 4F is impaired.

## ARTICLE IV
## ALLOWANCE OF CLAIMS AND TREATMENT OF DISPUTED CLAIMS

**4.1**   **Claim Objections**

The Debtors and other parties-in-interest may object to the amount or validity of any Claim within ninety (90) days after the Effective Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtors will pay the Allowed Claim in accordance with the Plan.

**4.2**   **Treatment of Executory Contracts and Unexpired Leases**

Executory Contracts are contracts where significant performance of the contract remains for both the Debtors and another party to the contract. The Debtors have the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtors' intentions regarding its Executory Contracts (which includes its unexpired leases that have not already been assumed or rejected) and the impact such intentions would have on the other parties to the contracts.

As of the Effective Date, all Executory Contracts shall be rejected if not previously rejected by order of the Court.  Any claimants that are parties to an Executory Contract with the Debtor that are rejected by operation of the Plan (as opposed to prior Court order), shall have thirty (30) days after the Effective Date to file a rejection claim. All rejection claims will be treated as Allowed Claims against the applicable Debtor.

## ARTICLE V
## PLAN IMPLEMENTATION

**5.1**   **Creditor Trust**

The Creditor Trust shall be established as of the Effective Date for the benefit of Creditor Trust Beneficiaries and shall be governed by the Creditor Trust Agreement.

Maria Aprile Sawczuk shall initially be designated as Creditor Trustee.  The Creditor Trustee will owe a fiduciary duty, consistent with the duties of trustees under Delaware law, to Creditor Trust Beneficiaries.

The Creditor Trustee shall administer the Creditor Trust Assets pursuant to the Plan and the Creditor Trust Agreement from and after the Effective Date and shall have the powers set forth herein and in the Creditor Trust Agreement, which powers shall include, without limitation, the right to: operate, sell, settle, or otherwise dispose of or liquidate the Creditor Trust Assets; object to or continue objecting to, or to seek to estimate Claims to the extent provided for hereunder; pursue and/or resolve Causes of Action; pursue and/or resolve Avoidance Actions; pursue

recovery of the ERC Tax Credits; make Distributions to Creditor Trust Beneficiaries; otherwise exercise such other powers as are customary for a trustee of a creditor trust of this nature.

**5.2** **Vesting of Assets in the Creditor Trust**

On the Effective Date and subject to the terms of the Plan, all Creditor Trust Assets shall be transferred to and vest in the Creditor Trust free and clear of all Claims and Equity Interests.

**5.3** **Creditor Trust Reserves**

The Creditor Trustee may, in its discretion, reserve funds as necessary (prior to making Distributions) to ensure that, without limitation, Creditor Trust Expenses can be paid and PACA Claims could be paid (in the event any such Claims are allowed).

**5.4** **Creditor Trust Accounting**

The Creditor Trustee will use reasonable best efforts to:

(a) Allocate Common Expenses among all of the Debtors on a Pro-Rata basis based on the amount of Distributable Proceeds ultimately available at each Debtor. The Debtors shall contribute funds to Etta Collective necessary to pay such fees and expenses, with the Debtors (and subsequently the Creditor Trustee) using reasonable efforts to have the Debtors share such expenses on as close to a Pro-Rata basis as reasonably practicable (including by reimbursing over-paying Debtors if Debtors that were initially unable to contribute their Pro-Rata share later become able to contribute more or their full share).

(b) Allocate Common Sale Expenses among all of the Selling Debtors based on the Selling Debtor Allocation to the extent reasonably practicable (including by reimbursing over-paying Selling Debtors if certain Selling Debtors that were initially unable to contribute their full Selling Debtor Allocation and later become able to contribute more or their full share).

**5.5** **Temporary Continued Existence of Debtors**

On and after, the Effective Date the Debtors will continue to exist and the Creditor Trustee shall become, for all purposes, the authorized representative of each of the Debtors. The Creditor Trustee will oversee the wind-up of the Debtors, including, without limitation, overseeing and paying accounting professionals to prepare final tax returns.

**5.6** **Post-Confirmation Reporting**

The Debtors shall file all monthly operating reports due prior to the Effective Date. After the Effective Date, the Creditor Trustee shall file quarterly post-Confirmation reports, served on the U.S. Trustee and the Subchapter V Trustee on or before the 20th day after the end of the calendar quarter. The reporting shall include at least the following information: (a) the bank name and account type of the Creditor Trust's bank accounts, (b) the name of the person with signatory authority over the accounts, (c) any investments (general type), if any, and where those investments

are located, (d) Plan disbursements during the reporting period (by Class), and (e) cumulative Plan disbursements to date.

## 5.7    Final Decree & Dissolution of Debtors

Once the Debtors' Estates have been fully administered, as provided in Bankruptcy Rule 3022, the Creditor Trustee shall file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Cases. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

After a final decree is entered in the Chapter 11 Cases, the Creditor Trustee shall dissolve the Debtors without any further action by the stockholders, officers, or directors of the Debtors. The Creditor Trustee may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to reflect the dissolution of the Debtors under Delaware and/or Illinois state law, where the Debtors are incorporated. All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Creditor Trustee on behalf of the Debtors and shall take all steps necessary to allow and reflect the prompt dissolution of the Debtors as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Creditor Trustee may determine in his or her sole discretion. The Creditor Trustee's expenses for dissolving the Debtors and winding up the Creditor Trust shall be deemed Creditor Trust Expenses and the Creditor Trustee is entitled to reserve sufficient Creditor Trust Assets necessary to ensure that all Creditor Trust Expenses can be paid. The Court may issue one or more Orders noting the Effective Date as evidence of the dissolution of the Debtors.

## 5.8    Tax Consequences of the Plan

**CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.**

## ARTICLE VI
## DISTRIBUTIONS

## 6.1    Timing and Effective Date of Distributions

The Debtors and Creditor Trustee, as applicable, shall make distributions as provided for herein, and as a general matter shall use reasonable efforts to make distributions under the Plan as soon as reasonably possible after the Effective Date. Distributions made to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

## 6.2    Wintrust Distribution and True-Up

Although the four Wintrust Borrower Debtors are co-liable on the Wintrust Loans and resulting Claim, not all are expected to have sufficient assets on the Effective Date to pay their share of the Wintrust Secured Claim Allocation (and the Plan contemplates paying off Wintrust's

Claim on or as soon as possible after the Effective Date to stop the accrual of interest). As the Creditor Trust carries out its duties (*e.g.*, objecting to claims, collecting funds, and making distributions), even after the Wintrust Secured Claim has been paid in full, the Creditor Trust will make reasonable efforts to ensure that the Wintrust Secured Claim Allocation is honored to the extent reasonably possible. For example, if funds from only two of the Wintrust Borrower Debtors are initially used to pay off the Wintrust Secured Claim in full (*e.g.*, because the other Wintrust Borrower Debtors do not have funds on the Effective Date), if one or more of the non-paying Wintrust Borrower Debtors later end up having funds available for distribution, such funds will initially be used to reimburse the first two Wintrust Borrower Debtors until the Wintrust Secured Claim Allocation has been honored (or has come as close as reasonably possible to being honored). For the sake of clarity, distributions to Wintrust will also be in accordance with the Bucktown Lien Priority Settlement.

### 6.3    Method of Distributions to Holders of Claims

Distributions made pursuant to the Plan, shall be in U.S. dollars and, at the option and in the sole discretion of the Debtors or Creditor Trustee (depending on which is making the particular distribution), may be made by (a) checks drawn on or (b) wire transfers from a domestic bank selected by the Debtors or Creditor Trustee, as applicable.

### 6.4    Delivery of Distributions

Subject to the provisions of Rule 2002(g) of the Bankruptcy Rules, and except as otherwise provided herein, distributions and deliveries to Holders of Allowed Claims shall be made at the address (the "*Distribution Address*") of each such Holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by the address set forth on a timely filed proof(s) of claim or some other writing Filed with the Bankruptcy Court and served upon the Debtors and Creditor Trustee.

### 6.5    Tax Identification Numbers and OFAC Certifications

Notwithstanding anything in the Plan to the contrary, prior to the Creditor Trust making Distributions hereunder, the Creditor Trustee may require each Holder to furnish: (a) its Employer or Taxpayer Identification Number as assigned by the Internal Revenue Service on a Form W-9 and (b) a certification that the Holder is not a person or entity with whom it is illegal for a U.S. person to do business under Office of Foreign Assets Control ("*OFAC*") sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons (collectively, the "*Pre-Distribution Certifications*"). If required, the Creditor Trustee will mail Pre-Distribution Certification forms to the Distribution Address for each Holder prior to Distributions being made, and Holders shall have forty-five (45) days from the date of mailing to return the executed Pre-Distribution Certifications. Any Holder that fails to return the executed Pre-Distribution Certifications within such forty-five (45) day period shall be deemed to have forfeited its right to receive Distributions and shall be forever barred and enjoined from asserting any right to Distributions made prior to the Creditor Trustee receiving its executed Pre-Distribution Certifications (such a Holder would only be entitled to a Pro-Rata Share of remaining future Distributions, if any). Any Distributions that are forfeited pursuant to this provision will be retained by the Creditor Trust for further distribution pursuant hereto.

**6.6**     **Undeliverable Distributions**

1. Holding of Undeliverable Distributions

If any Distribution to any Holder of an Allowed Claim is returned to the party that made the Distribution (*i.e.*, the Creditor Trustee or Debtors, as applicable) as undeliverable, no further Distributions shall be made to such Holder unless and until the Creditor Trustee and Debtors are notified by such Holder, in writing, of such Holder's then-current address. Upon such an occurrence, the appropriate Distribution shall be made as soon as reasonably practicable after such Distribution has become deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Creditor Trustee or Debtors to attempt to locate any Holder of an Allowed Claim.

2. Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim entitled to an undeliverable or unclaimed Distribution that does not provide notice of such Holder's correct address to the Creditor Trustee and Debtors within ninety (90) days after the date of the initial Distribution made by the Creditor Trustee or Debtors to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Creditor Trustee and Debtors, as applicable. If, after ninety days, Distributions remain unclaimed, unclaimed Distributions will become Forfeited Distributions and such amounts shall become the property of the Creditor Trust.

In the event that the aggregate amount of the Forfeited Distributions is less than $20,000.00, or the Creditor Trust otherwise ends up with less than $20,000.00 without a realistic prospect of receiving additional Cash or other assets, and the Creditor Trustee determines, in his or her reasonable business judgment, that a further Distribution would not be economically justifiable (for example, a Distribution would result in *de-minimis* payments after costs) and that the remaining funds are not otherwise needed (*e.g.*, for winding up the Creditor Trust), the Creditor Trustee may donate such Forfeited Distributions to a 501(c)(3) benefitting Chicago, Illinois (where the majority of the Debtors' assets were located).

**6.7**     **Withholding and Reporting Requirements**

In connection with the Plan and all Distributions thereunder, the Creditor Trustee and Debtors shall comply with all tax withholding and reporting requirements imposed by any U.S. federal, state or local or non-U.S. taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Creditor Trustee and Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution, and (b) the Creditor Trustee and Debtors, as applicable, reserve the option, in their discretion, to not make a Distribution to or on behalf of such Holder pursuant to the Plan

unless and until such Holder has made arrangements satisfactory to the Creditor Trustee for the payment and satisfaction of such tax obligations or has, to the satisfaction of the Creditor Trustee or Debtors, as applicable, established an exemption therefrom.

## 6.8   Time Bar to Cash Payments

Checks issued by the Creditor Trustee or Debtors on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days from and after the date of issuance thereof. Requests for reissuance of any check that has become null and void shall be made directly to the party that issued the check (the Creditor Trustee or Debtors as the case may be) by the Holder of the Allowed Claim within thirty (30) days of the check becoming null and void.  After such thirty (30) day period has elapsed, all claims relating to such voided checks shall be discharged and forever barred.  In the case of checks issued on account of Allowed Claims but not negotiated within sixty (60) days of issuance and for which no request for reissuance is made before thirty (30) days after issuance, the amounts at issue shall be considered to be a Forfeited Distribution. Any creditor or claimant that fails to negotiate its check and seek reissuance shall be entitled to no further distributions on any Claim, regardless of Class.

## 6.9   Interest

Unless otherwise required by applicable bankruptcy law, or specifically provided for herein, post-petition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest or fees accruing on or after the Applicable Petition Date on any Claim.

In accordance with Section 502(b)(2) of the Bankruptcy Code, the amount of all prepetition Unsecured Claims against the Debtors shall be calculated as of the Applicable Petition Date. Except as otherwise explicitly provided in the Plan, in Section 506(b) of the Bankruptcy Code, or by Final Order, no Holder of a prepetition Claim shall be entitled to or receive interest or fees relating to such Claim.

## 6.10   Fractional Dollars; De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down.  The Creditor Trustee and Debtors will not make any payment of less than fifty dollars ($50.00) on account of any Allowed Claim, unless a specific request therefor is made in writing to the Creditor Trustee on or before sixty (60) days after the Effective Date.

## 6.11   Set-Offs

Consistent with applicable law, the Creditor Trustee and Debtors, as applicable may, but shall not be required to, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtors, their Estates, or the Creditor Trustee may hold against the Holder of such Allowed Claim; provided, however, that neither the

failure to effect such a set off nor the allowance of any claim hereunder shall constitute a waiver or release by the Debtors, their Estates, or the Creditor Trustee of any such claims, rights, and Causes of Action that the Debtors, their Estates, the Creditor Trust, or the Creditor Trustee may possess against such Holder.

**6.12    Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim with respect thereto, or any distribution to be made on account of such an Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims, and is fair, equitable and reasonable. For the avoidance of doubt and without limiting the foregoing, the entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the Bucktown Lien Priority Settlement.

**ARTICLE VII**
**BAR DATE FOR ADMINISTRATIVE CLAIMS**

**7.1    Bar Date for Administrative Claims**

Notwithstanding anything to the contrary or alternative provided by prior orders of the Bankruptcy Court regarding allowance or payment of Professional Fee Claims, all Persons requesting payment of any Administrative Claim, including but not limited to Professional Fee Claims, must file applications for payment no later than thirty (30) days after the Effective Date. Any Administrative Claims for which applications are not timely filed in accordance herewith will be deemed discharged and barred from being asserted against the Debtors; provided that previously approved or Allowed applications for Administrative Claims do not need to be re-filed.

**ARTICLE VIII**
**CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**

**8.1    Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. The liquidation analysis as attached hereto as Exhibit A.

**8.2    Conditions to Confirmation**

The Plan shall not be confirmed unless and until the following conditions have occurred:

a)  the Court approves this Plan and the disclosures contained herein and does not order,

26

pursuant to section 1181(b) of the Bankruptcy Code, that section 1125 of the Bankruptcy Code applies to these Chapter 11 Cases; and

b) the Court enters the Confirmation Order in form and substance acceptable to the Debtors.

**8.3**   **Conditions to Effective Date**

Unless waived in writing by the Debtors, the Effective Date shall occur only if:

a) the Confirmation Order has been entered and has not been vacated, reversed, stayed, enjoined, or restrained by order of a court of competent jurisdiction; and

b) the deadline for an appeal of the Confirmation Order has lapsed.

## ARTICLE IX
## DISCHARGE & EXCULPATION

**9.1**   **Discharge.**

**If the Plan is confirmed under § 1191(a),** on the Confirmation Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If the Plan is confirmed under § 1191(b),** as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt—

(1) on which the last payment is due after the first 3 years of the plan; or

(2) if applicable, of the kind specified in section 523(a) of this title.

**9.2**   **Exculpation**

Neither the Debtors nor any of their members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity, will not have or incur any liability to, or be subject to any right of action by, any Person or entity, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases or the pursuit of confirmation of the Plan, except to the extent arising out of fraud, willful misconduct, or gross negligence, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

**10.1    Headings for Convenience Only**

The headings in the Plan are for convenience of reference and will not limit or otherwise affect the meanings thereof.

**10.2    Binding Effect of Plan**

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, and any Holder of a Claim or Interest treated herein or any entity named or referred to in the Plan and each of their respective representatives, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

**10.3    Other Documents and Actions**

The Debtors are authorized to execute such documents and take such other action as is necessary to effectuate the transactions contemplated by the Plan.

**10.4    Modification of the Plan**

The Debtors may alter, amend or modify the Plan and related documents under section 1193(a) of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date, the Debtors may seek to modify the Plan at any time only if (i) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the Bankruptcy Court and (ii) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**10.5    Final Order**

Except as otherwise expressly provided in the Plan, the Debtors may waive any requirement in the Plan for a Final Order. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

**10.6    Severability**

Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Equity Security, such provision shall be unenforceable as to all Holders of Claims or Interests to the specific Holder of the Claim or Interest, as the case may be, as to which the provision is illegal. Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Debtors reserve the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.

**10.7    <u>Governing Law</u>**

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF DELAWARE OR THE UNITED STATES OF AMERICA.

**10.8    <u>Notices</u>**

Any notice required or permitted to be provided under this Plan shall be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; (iii) electronic mail; or (iv) reputable overnight delivery service, freight prepaid, with copies to the following parties:

**If to the Debtors:**

Maria Aprile Sawczuk, Esq.
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

and

Matthew E. McClintock, Esq.
Jeffrey C. Dan, Esq.
111 W. Washington Street, Suite 1221
Chicago, IL 60602
Telephone: (312) 337-7700
mattm@goldmclaw.com
jeffd@goldmclaw.com

**If to the United States Trustee:**

John Henry Schanne, II
Office of the United States Trustee
U. S. Department of Justice
844 King Street, Suite 2207
Lockbox #35
Wilmington, DE 19801
Email:  john.schanne@usdoj.gov

**If to the Subchapter V Trustee:**

Jami B Nimeroff
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801
Email: jnimeroff@bmnlawyers.com

**10.9   Filing of Additional Documents**

The Debtors are permitted to file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**10.10   Defenses with Respect to Claims**

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, with respect to any Claim, including but not limited to all rights in respect of legal and equitable defenses to setoffs or recoupments against such Claims.

**10.11   No Injunctive Relief**

No Claim shall under any circumstances be entitled to specific performance or other injunctive, equitable or prospective relief.

**10.12   No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of any classification of any Claim.

**10.13   Written Agreement**

Any provision of this Plan that requires written agreement may be satisfied by email or other electronic communication indicating agreement of the relevant party.

## ARTICLE XI
## RETENTION OF JURISDICTION

**11.1   Exclusive Jurisdiction of Bankruptcy Court**

The Bankruptcy Court will retain jurisdiction over this Case for the following purposes:

a) Resolution of any and all objections to Claims.

b) Unless otherwise determined by a court of competent jurisdiction, determination of all questions and disputes regarding all Causes of Action, controversies, disputes or conflicts, whether or not subject to pending actions as of the Confirmation Date, between: (i) the

Debtors and any other Person relating to any Claim or any term of the Plan or any transaction or act occurring under or pursuant to the Plan; or (ii) otherwise under the Plan, the Confirmation Order or any other order issued by the Bankruptcy Court in connection with this Case.

**c)** The correction of any defect and the curing of any omission or inconsistency in the Plan or the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan.

d) Modification of the Plan after the Confirmation Date pursuant to the Bankruptcy Code and the Bankruptcy Rules.

e) Allowance of all Claims and applications for payment of Administrative Claims and Professional Fee Claims, and Professional's expenses which may be paid by the Debtors pursuant to the provisions of the Plan and the Bankruptcy Code and resolution of all disputes pertaining thereto.

f) Enforcement of any order entered by the Bankruptcy Court.

g) Entry of a final order confirming substantial consummation of the Plan and closing the Case.

## 11.2    <u>Final Decree</u>

Once each estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Creditor Trustee shall file a motion with the Bankruptcy Court to obtain a final decree to close its case.

The Debtors believe that the Plan is fair and in the best interests of all Creditors. The Debtors will be seeking confirmation of the Plan pursuant to Section 1191(b) of the Bankruptcy Code, and as such, the Plan does not provide any Creditor with a right to vote.

**ARTICLE XII**

**DEFINED TERMS**

Unless the context otherwise requires, the following terms shall have the meanings ascribed to them below when used in capitalized form herein:

1.    **1840 North Ave.**: 1840 North Ave. Corp., an Illinois corporation and Debtor in these Chapter 11 Cases.

2.    **Administrative Claim**: A Claim for costs and expenses of administration of this Chapter 11 Case Allowed under section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code incurred after the Applicable Petition Date, including, but not limited to: (a) any actual and necessary costs and expenses of preserving the Debtors' Estate and operating the businesses of the Debtors (such as wages, salaries or commissions for services); (b) compensation for legal, consulting, accounting, and other services

and reimbursement of expenses Allowed by the Bankruptcy Court under section 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Debtors' Estates under section 1930, chapter 123 of title 28 of the United States Code; and (d) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court.

3.      **Administrative Tax Claim**: Any tax incurred pursuant to Section 503(b)(1)(B) of the Bankruptcy Code.

4.      **Allowed Claim**:  Allowed Claims are any Claim or Equity Interest, except as otherwise provided herein, which is:  (a) a Claim or Equity Interest that has been scheduled by the Debtors on their Schedules as other than disputed, contingent or unliquidated and as to which (i) the Debtors and no other party in interest has Filed an objection or (ii) no contrary proof of Claim has been Filed; (b) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been Allowed by a Final Order; (c) a Claim or Equity Interest that is Allowed: (i) in any stipulation with the Debtors establishing the amount and nature of such Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with the Debtors establishing the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with the Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (e) a Claim or Equity Interest that is Allowed pursuant to the terms of the Plan.

5.      **Allowed Secured Claim**: Allowed Secured Claims are Claims secured by property of the Debtors' bankruptcy estate to the extent allowed as secured claims under §506 of the Bankruptcy Code.

6.      **Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtors shall be entitled on the Confirmation Date.

7.      **Applicable Petition Date:** The Scottsdale Petition Date or the General Petition Date, as applicable.

8.      **Avoidance Actions**:  Any and all claims and causes of action against any Entity arising under sections 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or any other section of the Bankruptcy Code.

9.      **Aya**: Aya Pastry, a bakery located in Chicago, Illinois.

10.     **Aya Bakery**: Aya Bakery, LLC, a Delaware limited liability company and Debtor in these Chapter 11 Cases.

11.     **Ballot:** Each of the ballot forms distributed to each Holder of an Impaired Claim in which the Holder is to indicate acceptance or rejection of the Plan.

12.     **Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. § 101, *et seq*., as amended from time to time.

13.     **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

14.     **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

15.     **Bar Date**: The deadline for filing proofs of claim in these Chapter 11 Cases.

16.     **Broker**: Kudan Group, Inc., the Court-approved broker for the sale of the Debtors' businesses and related assets [*see* Docket No. 174].

17.     **Broker Fee**: The fees earned by the Broker and approved by the Bankruptcy Court for the Broker's services in connection with the Sale (including any approved expense reimbursement).

18.     **Bucktown Lien Priority Settlement**: that certain settlement agreement between the Wintrust, the SBA Lender, and the Debtors which settlement is incorporated herein and shall be approved via the Confirmation Order, and which provides that: (a) funds available for distribution to Creditors at the Etta Bucktown Debtor (e.g., after payment of Carve-Out amounts and Creditor Trust Expenses) shall be distributed in the following manner and order of priority: (i) to Wintrust for payment in full of the Wintrust DIP (which will have been paid prior to the Confirmation Date, but if not will be paid first); (ii) to the SBA Lender in the amount of $63,000; (iii) to Wintrust to fund Etta Bucktown's portion of the Wintrust Secured Claim as provided for hereunder; and (iv) to the SBA Lender up to the full amount of its claim, subject to the other provisions hereof and (b) upon the Plan Effective Date and receipt of the initial $63,000 payment set forth above, the SBA will promptly dismiss the SBA Adversary Proceeding with prejudice (but with SBA retaining all rights to enforce its rights hereunder).

19.     **Buyer**: InKind Cards, Inc.

20.     **Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned  thereon.

21.     **Causes of Action:** Any claim, cause of action, chose in action, action, suit, demand, and any other debt, obligation, right, damage, remedy, controversy, agreement, promise, lien, variance, trespass, power, privilege, license, franchise, judgment, third-party claim, subrogation claim, guaranty claim, contribution claim, reimbursement claim, indemnity claim, counterclaim, right of setoff or recoupment, crossclaim, claim objection, defense to claim, and liability whatsoever of any kind or character relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured,

disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise. Causes of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity belonging to the Estate; (b) any claim pursuant to sections 362, 502, and 510 of the Bankruptcy Code and any analogous provisions of applicable state law belonging to the Estate; (c) all Avoidance Actions, including any claim, right or cause of action related to any and all Avoidance Actions (including, but not limited to, any fraudulent conveyance or fraudulent transfer claims the Debtors may have pursuant to sections 544, 548 and 550 of the Bankruptcy Code or applicable non-bankruptcy law); (d) any claim or defense including, but not limited to fraud, mistake, duress, and usury and any other defenses belonging to the Estate pursuant to section 558 of the Bankruptcy Code; and (e) any claim, right, or cause of action against any insiders, officers, directors, recipient of a fraudulent transfer, and/or related entities. Attached hereto as <u>Exhibit B</u> is a supplement further describing certain known Causes of Action.

22. **Chapter 11 Cases**: These cases under chapter 11 of the Bankruptcy Code commenced on the Applicable Petition Date and jointly administered under Case No. 24-10063.

23. **Claim**: Any "Claim" (as defined in section 101(5) of the Bankruptcy Code) asserted against the Debtors, including, but not limited to: (a) any right to payment against, whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance, if such performance gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

24. **Class**: A category of holders of Claims or Equity Interests which are substantially similar to the other Claims or Equity Interests in such class, as set forth in Article III of the Plan.

25. **Common Expenses:** Expenses benefitting all of the Debtors, including Professional Fee Claims, Creditor Trust Expenses, and other similar amounts.

26. **Common Sale Expenses:** The Broker fee and all amounts paid to the stalking horse bidder in the Sale Transaction (break-up fee and expense reimbursement).

27. **Confirmation:** The entry by the Bankruptcy Court of an order confirming this Plan.

28. **Confirmation Date**: The date upon which the Bankruptcy Court shall enter the Confirmation Order on the docket in the Chapter 11 Cases.

29. **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

30. **Creditor**: Any person who has a Claim against the Debtors that arose on or before the Applicable Petition Date.

31.     **Creditor Trust**: common law trust to be established pursuant to the Plan for the sole and exclusive benefit of the Holders of Allowed Claims.

32.     **Creditor Trust Agreement**: agreement to be executed on or before the Effective Date among the Debtors and the Creditor Trustee establishing the terms and conditions of the Creditor Trust and the powers of the Creditor Trustee and filed with the Court no later than the 10th day before the Confirmation Hearing. A copy of the Creditor Trust Agreement is attached hereto as Exhibit C.

33.     **Creditor Trust Assets**: all of the Debtors' tangible and intangible assets existing as of the Effective Date including, without limitation: (i) the net Sale Proceeds; (ii) all of the Debtors' right, title, and interest in and to all the ERC Tax Credits; (iii) all of the Debtors' right, title and interest in and to all Causes of Action, including the proceeds thereof; (iv) all rights of the Creditor Trust under the Plan, the Confirmation Order, and the Creditor Trust Agreement; (iv) all books and records related to the Debtors or their Estates; and (v) all equity interests owned by the Debtors.

34.     **Creditor Trust Beneficiaries**: each solely as and to the extent provided for in Article III of the Plan and related provisions: (a) Holders of Allowed Claims against and Equity Interest in the Debtors; and (b) parties (including Professionals) with Allowed Administrative Claims against the Debtors (in each case to the extent that they were not previously paid, settled, of otherwise satisfied).

35.     **Creditor Trust Expenses**: the reasonable expenses of administering the Creditor Trust, as provided for herein and in the Creditor Trust Agreement.

36.     **Creditor Trustee**: such Entity, including any replacement thereof or successor thereto, designated by the Debtors to serve as trustee for the Creditor Trust and to oversee the liquidation of the Creditor Trust Assets for the benefit of Creditor Trust beneficiaries in accordance with the Plan and the Creditor Trust Agreement.  The initial Creditor Trustee shall be Maria Aprile Sawczuk of Goldstein & McClintock LLLP.

37.     **Debtors**:  Etta Scottsdale, Etta River North, Etta Bucktown, Etta Collective, Aya Bakery, and 1840 North Ave., the debtors-in-possession in these Chapter 11 Cases.

38.     **Disputed Claim:** Any Claim or Equity Interest, or any portion thereof: (i) listed on the Schedules as unliquidated, disputed, or contingent; (ii) is the subject of an objection or request for estimation Filed or is otherwise disputed by the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (iii) such Claim is in excess of the amount scheduled as other than disputed, contingent, or unliquidated; or (iv) is otherwise disputed by the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by a Final Order.

39.    **Distribution:** any consideration given to any Entity by the Debtors or Creditor Trust under the Plan.

40.    **Distribution Address**: For each Holder, the address as set forth on the Debtors' Schedules filed with the Bankruptcy Court, unless superseded by the address set forth on a timely filed proof of claim or some other writing Filed with the Bankruptcy Court and served upon the Debtors prior to a Distribution being effectuated.

41.    **Distributable Proceeds** means, individually for each Debtor, all proceeds available for distribution from the liquidation of such Debtor's assets, including, without limitation and as applicable, such Debtor's portion of the Sale Proceeds, remaining Cash, and the proceeds of Creditor Trust Assets. When the term Distributable Proceeds is used with respect to all Debtors it refers to the foregoing but in the aggregate for all of the Debtors.

42.    **Effective Date**: The date the Debtors determine to be the Effective Date after the Conditions to the Effective Date set forth herein have been satisfied or waived.

43.    **Entity**: A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an Estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, the United States Trustee, or any other entity.

44.    **ERC Tax Credits**: Employee Retention Credits valued at approximately $1.01 million for Etta River North (which may be impaired for reasons the Debtors are investigating), $681,771 for Etta Bucktown, and $121,461 for Aya.

45.    **Equity Interest**:  An ownership interest in the Debtors.

46.    **Etta Bucktown**: Etta Bucktown, LLC (formerly known as Ezra 1840), a Delaware limited liability company and Debtor in these Chapter 11 Cases.

47.    **Etta Collective**: Etta Collective, LLC, a Delaware limited liability company and Debtor in these Chapter 11 Cases.

48.    **Etta River North**: Etta River North, LLC, a Delaware limited liability company and Debtor in these Chapter 11 Cases.

49.    **Etta Scottsdale**: Etta Scottsdale, LLC a Delaware limited liability company and Debtor in these Chapter 11 Cases.

50.    **Estates**: The estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon commencement of this Chapter 11 Case (each an "Estate").

50.    **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

51.    **Ezra 1840**: Ezra 1840, LLC, the former name of Etta Bucktown.

52.     **Filed or Filed**: means file or filed with the Bankruptcy Court via CM/ECF or via the Clerk's office in the Chapter 11 Cases.

53.     **Final Administrative Claims Bar Date**: the thirtieth (30th) day of after Effective Date; provided, however, that the Creditor Trustee, with the consent of the Debtors, may authorize the filing of an Administrative Claim after such 30th day by filing a notice on the docket in the Chapter 11 Case so extending the Final Administrative Claims Bar Date, service of which shall be deemed sufficient if served by the Creditor Trust on: (a) the United States Trustee and (b) all parties that have requested notice in the Chapter 11 Case or that otherwise receive notice through the Court's CM/ECF electronic filing system.

54.     **Final Decree**:  The decree contemplated under Bankruptcy Rule 3022.

55.     **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

56.     **Forfeited Distributions**: undeliverable or unclaimed Distributions relating to Allowed Claims, that are deemed forfeited pursuant to the Plan.

57.     **General Petition Date:** February 2, 2024 for each of Etta River North, Etta Bucktown, Aya Bakery, and 1840 North Ave. Corp.

58.     **Government Bar Date**: the deadline for filing proofs of claim in this Chapter 11 Case for Governmental Entities. The Court previously set the bar date as July 30, 2024.

59.     **Governmental Entities:** the United States, any of the individual fifty states, any commonwealth, district, territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a foreign state, or other foreign or domestic government.

60.     **Holder**:  Any Entity owning or holding a Claim or Equity Interest.

61.     **Impaired**:  When used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired withing the meaning of section 1124 of the Bankruptcy Code.

62.     **Insider**:  A Person with the meaning set forth in section 101(31) of the Bankruptcy Code.

63.     **Lien:** Any charge against or interest in property to secure payment of a debt or performance of an obligation.

64.     **PACA Claims:** claims asserted under the trust provisions of the Perishable Agricultural Commodities Act

65.     **Person**:  A "person" as defined in section 101(41) of the Bankruptcy Code.

66. **Plan:** This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

67. **Priority Claim**: Any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

68. **Priority Tax Claim**: Any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a) (8) of the Bankruptcy Code.

69. **Professional**: Any Person or other Entity that either (a) has been retained in the Chapter 11 Case by a Final Order of the Bankruptcy Court pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise, potentially including, but not limited to: Goldstein & McClintock LLLP and the Subchapter V Trustee; or (b) seeks compensation or reimbursement of expenses in connection with this Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

70. **Professional Fee Claim**: Claim of a Professional Person for compensation for services rendered in this Case prior to the Confirmation Date under sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code, for such Professional Person.

71. **Pro Rata:** means proportionately so that with respect to an Allowed Claim, the ratio of (a) (i) the amount of property distributed on account of a particular Allowed Claim to (ii) the amount of that particular Allowed Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims of the Class in which the particular Allowed Claim is included to (ii) the amount of all Allowed Claims in that Class.

72. **Sale Transaction:** the sale of substantially all of the Debtors' assets approved via the Sale Order.

73. **Sale Order**: that certain *Order (A) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Such Sale, and (C) Granting Related Relief* entered on April 5, 2024 [Docket No. 247].

74. **Sale Proceeds:** the Cash received by the Debtors in connection with the sale of the Debtors' assets in the Sale Transaction.

75. **Selling Debtor Allocation:** For purposes of determining Distributable Proceeds and sharing Common Sale Expenses, the Sale Proceeds shall be deemed to have been received as follows, which allocation is based on the highest individual bids received at the Auction for those Debtors whose assets were actually sold in the Sale Transaction: (a) Aya Bakery: 9%; (b) Etta Bucktown: 52%; and (c) Etta Scottsdale: 39%.

76. **Selling Debtors:** The Debtors whose assets generated Sale Proceeds in the Sale Transaction: Aya Bakery; (b) Etta Bucktown; and (c) Etta Scottsdale.

77. **SBA Lender**: LendingClub Bank, N.A. as successor-in-interest to Radius Bank.

78.    **SBA Lender Claim**: the claim of the SBA Lender on account of the SBA Loan, which claim shall be allowed in the amount of $1,320,550.15 (which amount shall override any and all proofs of claim filed by the SBA Lender to the extent inconsistent with the foregoing) and shall be treated as provided herein.

79.    **SBA Loan**: U.S. Small Business Association loan to 1840 North Ave. and Ezra 1840 (now known as Etta Bucktown) in the original principal amount of $2,300,000.

80.    **SBA Adversary Proceeding**: that certain adversary proceeding filed by the SBA Lender on February 22, 2024 styled *LendingClub Bank, N.A. vs. Wintrust Bank, N.A. and Etta Bucktown, LLC and Etta Scottsdale, LLC et al.* in the United States Bankruptcy Court for the District of Delaware, Adversary Proceeding No. 24-50019 (KBO). Upon Confirmation of the Plan the SBA Lender will dismiss the SBA Adversary Proceeding assuming the Confirmed Plan incorporates and approves the Bucktown Lien Priority Settlement.

81.    **Scottsdale Location**: the Etta restaurant located in Scottsdale, Arizona.

82.    **Schedules**: The schedules of assets and liabilities and the statements of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended.

83.    **Secured Claim:** (a) a Claim is secured by a Lien on a property in which the Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in an Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) a Claim Allowed under the Plan as a Secured Claim.

84.    **Secured Creditor**: Any Creditor that holds a Claim that is secured by property of the Debtors.

85.    **Scottsdale Petition Date**: January 18, 2024 for Etta Scottsdale.

86.    **Subchapter V Trustee:** Jami Nimeroff, the trustee appointed pursuant to 11 U.S.C. § 1183(a).

87.    **Superpriority Claim:** Any Claim accorded priority in right of payment under section 507(b) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

88.    **Unsecured Claim**: Any Claim against the Debtors other than an Administrative Claim, a Priority Tax Claim, a Secured Claim, a Priority Claim, a Superpriority Claim or an Equity Interest.

89.    **Unsecured Creditor**: Any Creditor that holds a Claim in the Chapter 11 Case which is not a Secured Claim.

90.    **Wintrust**: Wintrust Bank, N.A.

91.    **Wintrust Borrower Debtors**: Etta Bucktown, Etta Collective, Etta Scottsdale, and Etta River North.

92.    **Wintrust DIP**: the $125,000 in debtor-in-possession financing obtained by the Debtors from Wintrust.

93.    **Wintrust Secured Claim Allocation**: for purposes of Creditor Trust accounting, an equal (25% each) allocation of the Wintrust Secured Claim between the Wintrust Borrower Debtors or, if not all of the Wintrust Borrower Debtors have funds to contribute to payment of same, to the greatest extent possible Pro-Rata payment by those Wintrust Borrower Debtors that end up having funds available to contribute to payment of the Wintrust Secured Claim.

94.    **Wintrust Loans**: one (1) loan and one (1) line of credit to the Wintrust Borrower Debtors that have amounts owed to Wintrust.

95.    **Wintrust Secured Claim**: the allowed secured claim of Wintrust, including interest and fees.

|  |  |
|---|---|
| | Respectfully submitted, |
| Dated: May 10, 2024 | **GOLDSTEIN & MCCLINTOCK, LLLP** |

By: _/s/ Maria Aprile Sawczuk_
Maria Aprile Sawczuk, Esq. (Bar ID 3320)
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

-and-

Matthew E. McClintock, Esq. (admitted *pro hac vice*)
Jeffrey C. Dan, Esq. (admitted *pro hac vice*)
111 W. Washington Street, Suite 1221
Chicago, IL 60602
Telephone: (312) 337-7700
mattm@goldmclaw.com
jeffd@goldmclaw.com

*Counsel for the Debtors and Debtors-in-Possession*